UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
                                )
                                )
            V.                  )
                                )    CRIMINAL ACTION
                                )    No. 05-40033-FDS
THOMAS VIGLIATURA,              )
HERIBERTO ARROYO,               )
            Defendants.         )


                    GOVERNMENT'S TRIAL BRIEF

     The United States of America, by and through its attorneys

Michael J. Sullivan, United States Attorney for the District of

Massachusetts, George Vien, Assistant United States Attorney, and

Harry J. Matz, Senior Trial Attorney, Department of Justice

Narcotic and Dangerous Drug Section, respectfully submits its

Trial Brief.   This brief will review the factual background of

the case, the indictment, some of the Government's anticipated

proof, and certain legal issues that may arise, including the

elements of the charged offenses.

I.   Factual Background

     This case results from a DEA investigation of drug

trafficking in the Worcester area.  Defendants distributed

primarily gamma-hydroxybutyric acid (GHB), a Schedule I

controlled substance, and gamma-butyrolactone (GBL), a controlled

substance analogue of GHB.  The hub of the conspiracy was

Defendant Thomas Vigliatura, an amateur body builder who owned

and operated T. Vig's Sports Supplements Unlimited in Worcester.
Vigliatura was active in the nightclub and exotic dance club
scene.  Defendant Matthew McLaughlin was his source of supply for
GHB and/or its analogue GBL; McLaughlin regularly traveled from
Maine to Worcester and delivered up to 40 bottles at a time to
Mr. Vigliatura.  The two Worcester police officers, Brian
Benedict and Heriberto Arroyo, purchased bottles from Vigliatura
both for personal use and resale.

GHB and its analogues are popular among body builders,
strippers and people who enjoy dance clubs.  Body builders
believe the drugs help them sleep and recover from workouts.
Strippers and dance club goers find that the drugs lower
inhibitions without the hangover associated with alcohol.  GHB
and GBL are also known as "date rape drugs."

GHB is a central nervous system depressant abused because it
produces euphoria, intoxication and hallucinations.  It also
causes drowsiness, nausea, loss of inhibition, memory loss and
visual disturbances, and in higher dosages, unconsciousness,
seizures, severe respiratory depression, coma and death.  GHB can
be produced as a clear liquid, white powder or tablet; the GHB in
this case was in liquid form, which is the most common for
illicit trafficking.  The typical dose is one to five grams,
ingested orally after being mixed in a liquid, usually water or
alcohol.

GBL has a similar chemical structure to GHB and, in fact, automatically converts to GHB upon ingestion in the body. GBL can also be used to manufacture GHB outside the body by a very simple process, *e.g.,* by adding household lye. For this reason, Congress and DEA have made GBL a "listed chemical" and placed it on List I (of two). The illegal character of GBL – analogue versus listed chemical – depends on the facts of the case. The evidence in this case will show that the Defendants distributed GBL as a controlled substance analogue.

Before GHB was taken off the market and made a controlled substance on March 13, 2000, Defendant Vigliatura sold a variety of products in T. Vig's that contained GHB or its analogue, GBL. The Government will show that after that time, he engaged in more furtive sales of the same drugs from the office at his store and from his home.

## II.  The Indictment

Count One of the indictment charges four defendants, including two Worcester Police Officers (Brian Benedict and Heriberto Arroyo) and two others (Thomas Vigliatura and Matthew McLaughlin) with conspiracy to distribute, and possession with intent to distribute, gamma-hydroxybutyric acid (GHB), a Schedule I controlled substance, and gamma-butyrolactone (GBL), a controlled substance analogue of GHB, from the summer of 2000 to summer 2004. Counts Three, Four and Five also charge the lead

defendant, Thomas Vigliatura, with three substantive counts of possession with intent to distribute GBL (Count Three) and GHB (Counts Four and Five) based on undercover buys made by a cooperating witness, John Saari on February 4, March 4 and June 25, 2004.  Count Two charges Defendants Vigliatura, Benedict and Arroyo with conspiracy to possess cocaine and 3,4-methylenedioxymethamphetamine (MDMA, commonly known as "Ecstasy") from the summer of 2000 through the summer of 2004. There is a final Forfeiture Allegation seeking forfeiture of all property and proceeds derived from the drug trafficking.

Defendants Benedict and McLaughlin have pleaded guilty without a plea agreement with the Government.  The government believes it will enter into a cooperation agreement with defendant Benedict and call him as a witness at trial.  The trial will therefore determine the culpability of Defendants Vigliatura and Arroyo.

As the Court is aware related indictment charged a single defendant, Nicholas Police, with distribution of, and possession with intent to distribute, marijuana and cocaine.  The common element in the two cases is that undercover purchases were made by the same cooperating witness, John Saari.  Mr. Police has pleaded guilty.  This Court held an evidentiary hearing on September 19, 2006 and has scheduled sentencing for October 12, 2006.

III. <u>The Government's Proof</u>

   A.   <u>Undercover Purchases and Telephone Calls</u>

   The evidence will show that at the direction of and in cooperation with DEA, John Saari purchased GHB or GBL from Vigliatura on three occasions and received a sample on one occasion.  The three controlled buys are summarized in the table below.

<u>DEA Supervised Controlled Buys</u>

| <u>Date</u> | <u>Location</u> | <u>Descript ion</u> | <u>Cost</u> | <u>Contents (from Lab Analysis)</u> | |
|---|---|---|---|---|---|
| Feb. 4, 2004 | Vigliatura's home | 2 bottles | $240 | 1,796 gm of GBL | |
| March 4, 2004 | Vigliatura's home | 4 bottles | $480 | 3,497 gm of GHB and GBL | |
| June 25, 2004 | T. Vig's store | 4 bottles | $500 | 3,290 gm of GHB and GBL | |

   On another occasion, March 13, 2005, Mr. Saari obtained a sample of GHB from Defendant Vigliatura at T. Vig's.  During the visit, Defendant Vigliatura admitted to possession of a large quantity of GHB, and the two engaged in conversations about the quality of GHB going around in Worcester.  To demonstrate the quality of his GHB, Vigliatura gave Saari a sample, which was subsequently determined to contain 24.2 grams of GHB, as well as GBL.

   The contents of the drug exhibits were analyzed at the DEA

Northeast Laboratory in New York City.  Defendants have not yet
stipulated to the validity of the results.  To authenticate and
support the analyses, the Government is prepared to call Michelle
G. Comelier, the Senior Forensic Chemist who performed the
analyses.

Mr. Saari also engaged in incriminating, consensual recorded
telephone conversations with Defendant Vigliatura and wore a
recording device during some of the transactions.  The Government
will offer at least some of these recordings at trial.

B.    Historical Witnesses

In addition to the undercover operation the government
intends to call historical witnesses who will testify concerning
the conspiracy.  Although the witnesses have different
perspectives, in general at least some will testify that
Vigliatura received GHB/GBL from Matt McLAUGHLIN and that
defendant Arroyo purchased GHB/GBL from Vigliatura for personal
use and distribution.   Some witnesses will testify that the
defendants also used illegal drugs together and with others. IV.

IV.    Legal Issues

A.    GHB, GBL and the Analogue Statute

The presence of GBL in this case, and its status as an
analogue of GHB, presents an unusual but not unprecedented legal
issue.

1.    Regulation of GHB and GBL

GHB is a Schedule I controlled substance for purposes of this prosecution.  Congress directed the Attorney General (delegated to DEA) to place GHB in Schedule I in 2000 in the Hillory J. Farias and Samantha Reid Date-Rape Drug Prohibition Act of 2000 (the GHB Law), P.L. 106-172, signed on February 18, 2000.  A DEA regulation, published at 65 Fed. Reg. 13,235 and effective March 13, 2000, implemented this congressional directive.[1]  *See* 21 C.F.R. § 1308.11(e)(1).  In the same law, Congress added gamma-butyrolactone (GBL) to the list of Schedule I controlled substances, amending 21 U.S.C. 802(34).[2]

However, GBL is not an ordinary List I chemical.  While it is a precursor chemical that can be used to produce GHB through a simple process (e.g., by addition of household lye), it is also an analogue of GHB that rapidly converts into GHB in the body after ingestion.  For this reason, it is often trafficked – as in this case -- not as a precursor but as a drug of abuse in itself.  In fact, once GHB became a scheduled controlled substance, it became harder to obtain; much of the illicit traffic shifted to

---

[1] An exception to the Schedule I status of GHB is not applicable to this case:  Where GHB is contained in an FDA-approved drug products (for example, Xyrem, which was approved by the FDA as a treatment for a rare form of narcolepsy on July 17, 2002), it is subject to the less stringent physical security requirements applicable to Schedule III controlled substances.  If trafficked, however, such pharmaceutical forms of GHB are punishable on the same basis as illicitly produced forms.

[2] DEA's final rule implementing the directive to list GBL was issued and effective on April 24, 2000 (65 Fed. Reg. 21645).  *See* 21 C.F.R. § 1310.02(a)(24).

GBL and 1,4-butanediol, which remain available for a host of industrial uses.

In cases where GBL is sold for ingestion, it meets the definition of a controlled substance analogue under the CSA, and traffickers are subject to the penalties applicable to the Schedule I substance GHB. "A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I." 21 U.S.C. §§ 813. Congress was well aware when it made GHB a controlled substance that GBL (and another List I chemical, 1,4-butanediol) could be substituted for GHB. The "Findings" included in the GHB Law state as follows:

> If taken for human consumption, common industrial chemicals such as gamma butyrolactone (GBL) and 1,4-butanediol are swiftly converted by the body into GHB. Illicit use of these and other GHB analogues and precursor chemicals is a significant and growing law enforcement problem.

Pub.L. 106-172, § 2(4). Because GBL has legitimate uses in industry, Congress could not make it a controlled substance. However, Congress did foresee the issue of sales of GBL for human consumption and stated its view that such cases should be prosecuted under the analogue statute.

> The designation of gamma butyrolactone or any other chemical as a listed chemical pursuant to paragraph (34) or (35) does not preclude a finding pursuant to subparagraph (A) of this paragraph that the chemical is a controlled substance analogue.

21 U.S.C. § 802(32)(B).

-8-

2.   <u>Scope of the Analogue Issue in This Case</u>

Because the controlled substance GHB itself is also involved
in this case – and was found in a majority of the drug exhibits
analyzed -- this case does not turn solely on proof of GBL as an
analogue of GHB.  Three of the four GHB/GBL drug exhibits contain
both GHB and GBL.  Most of the drug quantities that the
Government expects to prove as relevant conduct in the conspiracy
will be demonstrated through historical testimony.  It is not
possible for the Government or anyone at this point to ascertain
the precise make-up of those compounds, but a reasonable
assumption is that the unseized drugs resemble the seized ones.
On the street, these substances are frequently trafficked and
abused interchangeably and referred to simply as "G."[3]

To the extent that the substances distributed as part of the
Defendants' conspiracy involved "any material, compound, mixture,
or preparation which contains any quantity of . . . [GHB]," this
Court should treat the entire quantity as GHB.  The presence of
GBL in the solution should be treated like water, alcohol or any
other medium or impurity.  For sentencing purposes, the GBL is
simply part of the "mixture or substance containing a detectable

---

[3] Likewise, the issue does not arise should the facts show that a defendant believed that
he was selling GHB, or that he was selling "G" and that such substance was controlled.  In that
case, the fact that the GHB or "G" turned out on chemical analysis to be GBL is a mistake of
fact; the *mens era* existed to sell the controlled substance GHB.  The analogue issue is only
directly broached in situations where the Defendant did not think he was selling GHB or other
controlled substance and did not in fact sell GHB.

amount" of GHB.  See Note (A) to the Drug Quantity Tables at USCG § 2D1.1©.

To the extent that GBL alone, and not in combination with GHB, is involved – a matter that will depend to some extent on the evidence at trial – the United States will show that in this case GBL was intended for human consumption and is a controlled substance analogue of GHB.

3.  Elements of the Analogue Act

Congress amended the Controlled Substances Act in 1986 by prohibiting trafficking in "controlled substance analogues" and treating analogues as Schedule I controlled substances.  Enacted as part of the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, the Controlled Substance Analogue Enforcement Act of 1986 (Analogue Act) was designed "to prevent underground chemists from producing slightly modified drugs that are legal but have the same effects and dangers as scheduled controlled substances," *United States v. Hedge*, 321 F.3d 429, 432 (3d Cir. 2003). The Analogue Act defines a controlled substance analogue as a substance –

(i)   the chemical structure of which is substantially similar to the chemical structure of a controlled substance in Schedule I or II;

(ii)  which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in Schedule I or II; or

-10-

> (iii)     with respect to a particular person, which such
>           person represents or intends to have a stimulant,
>           depressant, or hallucinogenic effect on the
>           central nervous system that is substantially
>           similar to or greater than the stimulant,
>           depressant, or hallucinogenic effect on the
>           central nervous system of a controlled substance
>           in Schedule I or II.

21 U.S.C. § 802(32)(A).

Although a plain reading of this definition might lead to construe the three "prongs" in the disjunctive, a strong consensus of federal courts has adopted a partial conjunctive construction.  Courts generally require the prosecution to prove prong (I) -- substantial similarity of chemical structure – in all cases, _and_ _either_ prong (ii) -- substantial similarity in psychoactive effect – _or_ (iii) – representation as having such effect in the case at issue.[4]  The First Circuit has not decided the question, but the District of Massachusetts agreed with this consensus in the only reported decision here.  _United States v. Sole_, 2005 WL 1668384 (D. Mass 2005) (Zobel, J.).  Without conceding the argument for another case, the Government will

---

[4] See _United States v. Roberts_, 363 F.3d 118, 120 (2nd Cir. 2004)(government failure to appeal trial court's ruling assumed to say that partial conjunctive interpretation is correct); _United States v. Hodge_, 321 F.3d 429, 432-39 (3d Cir.2003) (reviews legislative history of the Analogue Act); _United States v. Washam_, 312 F.3d 926, 930 n. 2 (8th Cir.2002); _United States v. McKinney_, 79 F.3d 105, 107-08 (8th Cir.1996), _vacated on other grounds_, 520 U.S. 1226 (1997); _United States v. Forbes_, 806 F.Supp. 232, 236 (D.Colo.1992) (conjunctive reading avoids unintended results and supported by legislative history).  The cases appearing to favor a purely disjunctive reading do not engage in extensive analysis.  See _United States v. Fisher_, 289 F.3d 1329, 1338 (11th Cir.2002) (expressly declining to decide the issue); _United States v. Granberry_, 916 F.2d 1008, 1010 (5th Cir.1990) (stating the test in the disjunctive without discussion).

attempt to meet the partial conjunctive test in this case and will propose a jury instruction accordingly.

The question whether a substance is an analogue is one of fact necessary to constitute the crime, *see In re Kinship*, 397 U.S. 358, 364 (1970).  The Government will therefore provide up to three expert witnesses to show that GBL meets the first two prongs of this test.[5]   The expected testimony is as follows.

### James V. DeFrancesco, Ph.D.

Dr. James V. DeFrancesco is a Senior Forensic Chemist with the DEA North Central Laboratory in Chicago and is an expert in forensic chemistry and organic chemistry.  Dr. DeFrancesco will testify regarding prong (I) of 21 U.S.C. § 802(32)(A), to the effect that the chemical structure of gamma-butyrolactone ("GBL") is substantially similar to that of the Schedule I controlled substance gamma-hydroxybutyric acid ("GHB").  He will give his opinion that GBL is an analogue of GHB as defined in the statute.

### Andrew Coop, Ph.D.

Dr. Andrew Coop is an associate professor in the Department of Pharmaceutical Sciences at the University of Maryland School of Pharmacy.  He is an extensively published expert in chemistry and pharmacology.  Dr. Coop will testify primarily on prong (I) of 21 U.S.C. § 802(32)(A) concerning the similarity of chemical

---

[5] The factual evidence at trial should also prove prong (iii) – that the substance was represented as having an effect on the body similar to a controlled substance.  That is not a matter on which expert testimony is probative.

structure between GBL and GHB, but his pharmacology expertise will also permit him to render an opinion on prong (ii) with respect to similarity of effect on the central nervous system. He will testify that GHB and GBL both contain four carbon atoms and differ by only three atoms, and that these differences are consistent with a finding that they have substantially similar chemical structures.

<u>Deborah L. Zvosec, Ph.D.</u>

Dr. Zvosec is an investigator for the Minneapolis Medical Research Foundation with a Ph.D. in medical anthropology and is a published expert in GHB and related compounds. Dr. Zvosec is expected to testify regarding prong (ii) of 21 U.S.C. § 802(32)(A), to the effect that GBL is an industrial solvent that, when ingested, is rapidly metabolized to GHB, causing substantially similar or greater effects. Dr. Zvosec will testify that the effects of both substances include, *inter alia*, a lowered level of consciousness, reduced heart rate, lightheadedness or fainting and respiratory depression. She may also offer testimony concerning whether certain quantities of drugs are distribution versus personal use amounts.

4. <u>Sentencing Factors: GHB</u>

Sentences in this case will be driven by drug quantities. Most of the quantity will be based on historical evidence. The Government expects to show that Vigliatura received approximately

-13-

10 quarts of GHB and/or GBL every month for approximately 48 months, which produces a rough estimate of 480 quarts (120 gallons) during the conspiracy.

The statutory penalty exposure for each of the GHB / GBL analogue counts is up to 20 years imprisonment.  21 U.S.C. § 831(b)(1)( C).  The  Federal Sentencing Guidelines, which are now advisory, changed with respect to GHB, effective November 1, 2004, shortly after the offense conduct in this case.  See 68 Fed. Reg. 75339 (Dec. 30, 2003) (new guideline for GHB of 1 ml = 8.8 gm of marijuana, and proposed application note clarifying guidelines for analogues) and 69 Fed. Reg. 2169 (additional clarification on analogues).  As the changes in substantive guidelines equivalencies adversely affect Defendants, the newer (and current) guidelines should not be applied in this case, to avoid *ex post facto* clause concerns.  See USCG § 1B1.11(b)(1).  Thus, the guidelines effective in November 2003 apply to the conspiracy count, and the November 2002 guidelines – which are identical in pertinent respects – apply to the substantive counts of GHB trafficking.

Under the applicable guidelines, the starting point is that GHB is a Schedule I depressant drug.  See 21 C.F.R. 1308.12(e).  Sentences for a Schedule I or II depressant are calculated in "units."  One "unit" is equal to 0.5 grams in liquid form. Note (F) to the Drug Quantity Table at USCG § 2D1.1.  The calculation

is as follows:

> 1 gallon of GHB = 3.785 liters = 3,785 milliliters (ml) = approximately 3,785 grams (conservatively, as 1 ml GHB weighs slightly more than 1 gram)
>
> 3,785 grams contains 7,570 units of GHB (3,785 ÷ 0.5 = .7,570). Thus, each gallon contains 7,570 units
>
> 120 gallons x 7,570 units per gallon = 908,400 units
>
> Level 30 corresponds to 700,000 to 1,000,000 units of Schedule I or II depressants, per USCG 2D1.1(c)(5) (Drug Quantity Table)

A similar calculation using the same factors can be performed for any quantity of GHB or GBL that the trier of fact finds to have been trafficked in this case.

     5.  <u>Sentencing Factors: GBL as Analogue</u>

The Sentencing Guidelines in force at the time of the offenses in this case did not explicitly address controlled substance analogues. Adopting the general rule of construction in USCG § 2X5.1 to apply "the most analogous offense guideline", courts logically based their sentences on those for the controlled substance to which the substance is an analogue. This is the approach suggested by the plain words of 21 U.S.C. § 813: "A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I." In a case with striking factual similarities to the instant one, the court in *Casey v. United States*, 2002 WL 174042 (D. Minn. 2002), used the GHB guideline to sentence defendant Casey for distributing

GBL and 1,4-butanediol as analogues from the backroom of a
Minneapolis sports nutrition store where he was a manager.  The
opinion notes an unpublished Eighth Circuit decision in that case
approving the methodology used.  *United States v. Casey*, 2002 WL
237747 at 2 (8th Cir. 2002)(unpublished).  A similar approach
with a different analogue was adopted by the Ninth Circuit in
*United States v. Ono*, 918 F. 2d 1462, 1467 (9th Cir. 1990) (but
reversing and remanding for resentencing based on a different
error).[4]

As a result of more recent amendments, the Guidelines now
provide clearly for the same approach.

> Analogues and Controlled Substances Not Referenced in
> this Guideline. **--** Any reference to a particular
> controlled substance in these guidelines includes all
> salts, isomers, all salts of isomers, and, except as
> otherwise provided, *any analogue of that controlled
> substance*. . . . . For purposes of this guideline
> "analogue" has the meaning given the term "controlled
> substance analogue" in 21 U.S.C. § 802(32).  In
> determining the appropriate sentence, the court also
> may consider whether the same quantity of analogue
> produces a greater effect on the central nervous system
> than the controlled substance for which it is an
> analogue.

USCG § 2D1.1, App. Note (5) (emphasis added), as revised by
Amendment 667 (effective Nov. 1, 2004) and Amendment 679
(effective Nov. 1, 2005).  This Court may consider this post-

---

[4] The Court of Appeals found error in applying a multiplying factor based on the greater
potency of the analogue (OPP/PPP) compared to the controlled substance (MPPP), but left the
door open for an upward departure based on potency.  The trial judge took that cue, made an
upward departure, and was affirmed in *United States v. Ono*, 997 F. 2d 647 (9th Cir. 1993).

offense revision – which comports with logic and the practice of courts as seen in reported decisions – "to the extent that such amendments are clarifying rather than substantive changes."  USCG § 1B1.11(b)(2).

    B.   Narcotics Trafficking Issues

        1.  Narcotics Conspiracy – 21 U.S.C. § 846

Title 21, United States Code, Section 846 punishes "[a]ny person who attempts or conspires to commit any [drug] offense . . . ."  In order to prove a violation of § 846, the government must show that (1) an agreement existed to either distribute a controlled substance or to possess a controlled substance with the intent to distribute it; (2) the defendant knew of the conspiracy; (3) the defendant intended to join the conspiracy; and (4) the defendant participated in the conspiracy.  United States v. Smith, 680 F.2d 255, 259 (1st Cir. 1982), cert. denied, 459 U.S. 1110 (1983); United States v. Vergara, 687 F.2d 57, 60 (5th Cir. 1982); United States v. Glascow, 658 F.2d 1036, 1040 (5th Cir. 1981); see also United States v. Lopez, 944 F.2d 33, 39 (1st Cir. 1991); United States v. Geer, 923 F.2d 892, 894 (1st Cir. 1991).

To be held responsible for participation in a criminal conspiracy, the defendant must be shown to have entered knowingly, willfully and intentionally into an agreement to further the conspiracy's purposes.  United States v. O'Campo, 973

-17-

F.2d 1015, 1020 (1st Cir. 1992).  To establish the conspiracy,
"[t]wo types of intent must be proven: intent to agree and intent
to commit the substantive offense."  United States v. Clifford,
979 F.2d 896, 898 (1st Cir. 1992); United States v. David, 940
F.2d 722, 735 (1st Cir.), cert. denied, 502 U.S. 989 (1991);
United States v. Drougas, 748 F.2d 8, 15 (1st Cir. 1984); see
also United States v. Ocampo, 964 F.2d 80, 82 (1st Cir. 1992).
Such intent may be proven by direct evidence or circumstantially.
United States v. Flaherty, 668 F.2d 566, 580 (1st Cir. 1981);

Similarly, the illicit agreement may be express or tacit and
may also be proven by direct or circumstantial evidence.
O'Campo, 973 F.2d at 1019; Drougas, 748 F.2d at 15; see also
United States v. Sanchez, 917 F.2d 607, 610 (1st Cir. 1990),
cert. denied, 499 U.S. 977 (1991).  Stated differently, the
agreement may be inferred from "a development and a collocation
of circumstances."  O'Campo, 973 F.2d at 1019 (quoting Drougas,
748 F.2d at 15).  Relevant considerations are the defendant's
words and actions as well as the "interdependence of the
activities and persons involved."  O'Campo, 973 F.2d at 1019;
United States v. Concemi, 957 F.2d 942, 950 (1st Cir. 1992)
(quoting United States v. Boylan, 898 F.2d 230, 242-42 (1st
Cir.), cert. denied, 498 U.S. 849 (1990)).  The requisite
agreement may be inferred from a particular course of conduct.
See United States v. Moran, 984 F.2d 1299, 1300 (1st Cir. 1993);

Concemi, 957 F.2d at 950.

The government is not required to plead or prove any overt act in furtherance of a section 846 conspiracy.  United States v. Bello-Perez, 977 F.2d 664, 669 (1st Cir. 1992).  The government must simply establish the essential nature of the plan and the defendant's connection to it.  O'Campo, 973 F.2d at 1019; Sanchez, 917 F.2d at 610.  In essence, the government need only demonstrate "a tacit understanding between [the defendant] and the other co-conspirators to possess drugs with intent to distribute."  United States v. Arboleda, 929 F.2d 858, 870 (1st Cir. 1991); United States v. Batista-Palanco, 927 F.2d 14, 18-19 (1st Cir. 1991) (citing United States v. Pacheco-Ortiz, 889 F.2d 301, 304 (1st Cir. 1989)); see United States v. Passos-Paternina, 918 F.2d 979, 986 (1st Cir. 1990), cert. denied, 499 U.S. 982 (1991).  The defendant need not know or agree upon every detail of the conspiracy.  O'Campo, 973 at 1019; Sanchez, 917 F.2d at 610.

Moreover, the agreement may be proven by direct as well as circumstantial evidence.  Drougas, 748 F.2d at 15.  It is not necessary to show that the defendant was acquainted with or knew all of the alleged coconspirators, or all the details of the conspiracy.  Vergara, 687 F.2d at 61 (citations omitted).  In addition, one who plays only a minor role in a conspiracy, or joined the conspiracy sometime after its inception, is guilty

nonetheless. Id.

      2.  <u>Possession with Intent to Distribute and
Distribution of a Controlled Substance - 21 U.S.C. §
841(a)</u>

Title 21, United States Code, Section 841(a), provides in
pertinent part:

      Except as authorized in this subchapter, it shall
be unlawful for any person knowingly or intentionally–

      (1) to ... distribute, or dispense, or possess
with intent to ... distribute, or dispense, a
controlled substance;

"The term 'distribute' means to deliver ... a controlled

substance. 21 U.S.C. § 802(11).  Deliver ... means the actual,

constructive, or attempted transfer of a controlled substance ...

whether or not there exists an agency relationship."  21 U.S.C. §

802(8). <u>United States v. Porter</u>, 764 F.2d 1, 11-12 (1st Cir.

1985).

Two separate criminal acts are set forth in Section 841(a):

(a)  Possession with intent to distribute a controlled
substance; and

(b)  Distribution of a controlled substance.

      3.  <u>Possession</u>

The elements of the offense of possession with intent to

distribute are: (1) the defendant possessed a controlled

substance; (2) the defendant intended to distribute said

controlled substance; and (3) the defendant acted knowingly.

<u>United States v. Lopez-Lopez</u>, 282 F.3d 1, 19 (1st Cir), <u>*cert.*

*denied*</u>, 122 S.Ct. 2642 (2002); <u>United States v. Vergara</u>, 687 F.2d

-20-

57, 61 (5th Cir. 1982).

It is not necessary to prove that the defendant was ever in actual possession of a controlled substance; it is sufficient to convict where it can be shown that the defendant was in constructive possession, or aided and abetted the possession of another. Lopez-Lopez, 282 F.3d at 19; United States v. Richardson, 764 F.2d 1514, 1524-35 (11th Cir. 1985).

Constructive possession is when a person "knowingly has the power and intention at a given time to exercise dominion and control over an object, either directly or through others. " United States v. Paredes-Rodriquez, 160 F.3d 49, 54 (1st Cir. 1998) (quoting United States v. Torres- Maldonado, 14 F.3d 95, 102 (1st Cir.1994)). Knowing the identity of a controlled substance and instructing another to get it is sufficient. Richardson, 764 F.2d at 1525.  One whose actions are a "material aid" in securing a controlled substance is guilty of aiding and abetting its possession, and if the possession is with intent to distribute, then he is guilty of possession with intent to distribute. Id. "Possession may be shared among several conspirators, each of whom performs a distinct role in the transaction." United States v. Davis, 679 F.2d 845, 853 (11th Cir. 1982).

Proof that one has the "ability to assure delivery is enough, in combination with association with actual possessors,

to convict of constructive possession ... [because one] who can <u>assure</u> the delivery of a good controls it." United States v. Manzella, 791 F.2d 1263, 1267 (7th Cir. 1986) (emphasis in original) (citations omitted).

Although intent to distribute may be inferred from the possession of a large quantity of drugs, Vergara, 687 F.2d at 62, no specific amount of controlled substance is required to prove a violation of Section 841.  United States v. McHugh, 769 F.2d 860, 868 (1st Cir. 1985).

The nature of the particular controlled substance can be proven through circumstantial evidence. United States v. Drougas, 748 F.2d 8, 15 (1st Cir. 1984).  In addition, the government need not prove that the defendant knew the exact nature of the controlled substance.  It is sufficient to show that he knew that the item was an illicit controlled substance.  United States v. Kairouz, 751 F.2d 467 (1st Cir. 1985); United States v. Cheung, 836 F.2d 729, 731 (1st Cir. 1988).

        4.  Distribution

The elements of the offense of distribution of a controlled substance are: (1) the defendant distributed a controlled substance and (2) the defendant acted knowingly. United States v. Nelson, 563 F.2d 928, 931 (8th Cir. 1977).  Possession (actual or constructive) is not an element of distribution. Id.  The crime of "distribution" is defined broadly "to include acts which

perhaps traditionally would have been defined as mere aiding and

abetting." United States v. Oquendo, 505 F.2d 1307, 1310 n.1

(5th Cir. 1975).

> [T]he distribution provision has been held to
> criminalize "participation in the transaction viewed as
> a whole." Such participation may consist of or include
> the transfer of actual possession, or the transfer of
> constructive possession. However, distribution may
> also consist of or include other acts perpetrated in
> furtherance of a transfer or sale, such as arranging or
> supervising the delivery, or negotiating for or
> receiving the purchase.

United States v. Brunty, 701 F.2d 1375, 1381 (11th Cir. 1983)

(citations omitted). Although an "exchange of money is not a

required element of the offense," one who assists in the transfer

or the process of the transaction, even after the actual

distribution of the drugs, is guilty of aiding and abetting the

distribution. United States v. Coady, 809 F.2d 119, 124 (1st Cir.

1987). In addition, one can be found to have aided and abetted a

distribution even where he has no "interest or stake in the

transaction." United States v. Winston, 687 F.2d 832, 834 (6th

Cir. 1982).

> [T]he term "distribute," 21 U.S.C. § 802(11), is not
> restricted to distribution of a drug to the ultimate
> consumer. It also may, in appropriate circumstances,
> refer to the distribution of a controlled substance
> from one coconspirator to another.

United States v. Pool, 660 F.2d 547, 561 (5th Cir. 1981)("the

transfer of marijuana from the mother ship to the off-load boats

constitutes distribution as contemplated by 21 U.S.C. §

802(11)").

Each separate physical delivery of a controlled substance constitutes a distribution and can be charged as a separate count. <u>Blockburger v. United States</u>, 284 U.S. 299 (1932); <u>United States v. Zuleta-Molina</u>, 840 F.2d 157, 158-59 (1st Cir. 1988).


                         Respectfully Submitted,

                         MICHAEL J. SULLIVAN
                         United States Attorney


                   By:   <u>/s/ George W. Vien</u>
                         George W. Vien
                         Assistant United States Attorney
                         Harry J. Matz
                         Senior Trial Attorney

### Certificate of Service

         I hereby certify that this document filed through the
ECF system will be sent electronically to the registered
participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non
registered participants on October 9, 2006.

                         <u>/s/ George W. Vien</u>
                         George W. Vien
                         Assistant U.S. Attorney